**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Julie Thurston, | No. CV-23-01097-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Western Alliance Bank, et al., | |
| Defendants. | |

Plaintiff Julie Thurston accuses Defendants Western Alliance Bank ("Western Alliance") and Michelle Lance (collectively, "Defendants") of violating the Family and Medical Leave Act ("FMLA"). Before the Court is Defendants' motion for summary judgment (Doc. 77), which is fully briefed.[1] (Docs. 84, 89.) For the following reasons, the Court grants the motion.

## I.    Background

Thurston began working for Western Alliance as a Senior Product Manager in December 2019. (Doc. 77-2 at 98–100, 102.) In March 2020, Lance became Thurston's direct supervisor. (*Id.* at 118.) In August 2020, Lance issued Thurston an Ad Hoc Performance Review which identified both positive and negative aspects of Thurston's performance. (*Id.* at 154–160.)

---

[1] Oral argument is denied because the motions are adequately briefed, and oral argument will not help the Court resolve the issues presented. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

In September 2020, Thurston informed Lance that she would need surgery in October 2020. (*Id.* at 178.) Lance immediately involved Human Resources ("HR") and someone from HR contacted Thurston by e-mail to "Review FMLA" but Thurston was not yet FMLA eligible. (*Id.* at 178, 180.) Prior to the surgery, on September 30, 2020, Lance emailed Thurston because Thurston had been absent from a meeting without notifying Lance. (*Id.* at 226.) Then in early October, still prior to the surgery, Lance met with Thurston and followed up by email to "Reset[] Expectations" regarding Thurston's performance and knowledge of Western Alliance's products. (*Id.* at 228.) Defendants approved Thurston's two-week leave request from October 19 to November 2, 2020, for Thurston's surgery and recovery. (*Id.* at 94, 228.) Defendants then approved additional pre-surgery leave. (*Id.* at 231.) All parties agree that Thurston became eligible for FMLA benefits on December 19, 2020. (Doc. 84 at 8.)

In January 2021, Thurston received an "Achieved Objectives" rating for her 2020 Annual Performance Review based on goals set in 2020 before Thurston reported to Lance. (Doc. 77-2 at 265–69.) However, on January 22, 2021, Lance directed Thurston to pause work on a project after Lance received feedback from multiple sources that during a meeting Thurston displayed a lack of knowledge concerning the project's subject matter. (*Id.* at 276–77.) This project was one of only two major projects that Thurston was responsible for. On January 26, 2021, Lance sought to reclassify Thurston as a Product Manager rather than a Senior Product Manager because a significant portion of Thurston's responsibilities had been removed from her which necessitated the hire of an additional employee. (*Id.* at 282.) Lance informed Thurston of the reclassification on February 1, 2021. (*Id.* at 284.) The reclassification did not affect Thurston's salary. (*Id.*)

Then on March 2, 2021, a meeting between Thurston and two other employees became heated. (Doc. 77-3 at 11–13.) The next day, Lance followed up with Thurston about the incident and indicated in part that "there is no time or tolerance for less than professional behavior." (*Id.* at 13.) Lance also informed HR about Thurston's behavior and the fact that Thurston's work was not being completed in a timely matter. (*Id.* at 26.) From

April 24 to May 4, 2021, Thurston traveled to Turks and Caicos for vacation. (Doc. 77-2 at 250–51.) Then on May 12, 2021, Thurston gave a presentation that Lance informed HR was "lackluster at best" and indicated that Thurston had over a year to prepare for the presentation. (Doc. 77-3 at 42.)

As a result, Lance drafted a Performance Improvement Plan ("PIP") for Thurston in conjunction with HR. (*Id.* at 44–49.) On May 18, 2021, Lance and a member of the HR team presented the PIP to Thurston. (*Id.* at 51, 54–56.) Defendants provided Thurston with 30 days to improve. (*Id.* at 56.) At the PIP meeting, Thurston responded that the issues were a result of her health issues. (Doc. 77-2 at 71–72, 140.) The HR employee informed Thurston that an appropriate employee from HR would be in touch. (*Id.* at 140.) The next day, HR sent Thurston FMLA information and Thurston then discussed FMLA with HR by phone. (Doc. 77-3 at 70–74.) Thurston applied for FMLA leave and was approved for intermittent leave on June 4. (*Id.* at 107.)

On June 17, 2021, Lance conducted a meeting with Thurston and other employees. (Doc. 77-2 at 86–87.) During the meeting, Lance asked Thurston and the others when they anticipated completing the required compliance training. (*Id.*) Lance reported that in response Thurston had laughed at and mocked Lance. (*Id.* at 144.) As a result, Lance recommended that Defendants terminate Thurston's employment and on June 18, 2021, Defendants did so. (Docs. 84-2 at 66; 77-3 at 128.)

Thurston filed this action on June 15, 2023 (Doc. 1), and a first amended complaint ("FAC") on October 11 (Doc. 13) bringing claims of interference and retaliation under the FMLA against all Defendants as well as claims solely against Western Alliance under the Equal Pay Act and for intentional infliction of emotional distress. The Court granted in part Defendants' motion to dismiss and dismissed the Equal Pay Act claim. (Doc. 22 at 6, 9.) Defendants now move for summary judgment on the remaining claims.

**II.    Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the non-moving party,

the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the non-moving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record], if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (quotation omitted). The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal quotation and citation omitted). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies. Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

### III.   Analysis

####   A.   Preliminary Matters

#####     1.   Employer Liability

As a preliminary matter, Defendants assert that Lance is entitled to summary judgment on the FMLA claims because Lance was not Thurston's employer and therefore cannot be held personally liable. (Doc. 77 at 15–16.) Recognizing that the Ninth Circuit has not addressed individual liability under the FMLA, Defendants point to district courts in this Circuit that have looked to the Fair Labor Standards Act ("FLSA") precedents for guidance. (*Id.*) Thurston responds that Lance was her employer because Lance had the authority to hire and fire her. (Doc. 84 at 28.) Thurston does not oppose referring to FLSA precedents for guidance on this issue. (*Id.*)

The FMLA defines employer to "include[ ] . . . any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). "Where an individual exercises control over the nature and structure of the employment relationship, or economic control over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability." *Douglas v. Dreamdealers USA, LLC*, 416 F. Supp. 3d 1063, 1070 (D. Nev. 2019) (quoting *Boucher v. Shaw*, 572 F.3d 1087, 1090–91 (9th Cir. 2009)). Factors that indicate control include a "significant ownership interest with operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; [the power to] determin[e][ ] salaries; [and the responsibility to] maintain [ ] employment records." *Id.*

Here, Lance did not have the authority to fire Thurston. Lance "recommend[ed]" that Defendants terminate Thurston's employment but did not have the authority to so herself without approval. (Doc. 84-2 at 66.) Email correspondence makes clear that Lance had to coordinate with HR and needed the approval of Tim Boothe, Western Alliance's Chief Operating Officer, for Thurston's termination. (*Id.*) HR could not move forward with Thurston's termination without Boothe's approval. Accordingly, Lance is entitled to summary judgment on this issue.

### 2.    Statute of Limitations

Defendants also argue that most of Thurston's allegations were brought outside of the FMLA's two-year statute of limitations. (Doc. 77 at 16.) Defendants argue that because Thurston's complaint was filed on June 15, 2023, any alleged conduct prior to June 15, 2021, is time-barred. (*Id.*) Defendants accept that Thurston's termination is within the two-year time limit. (*Id.*) Thurston responds that Defendants' conduct was willful and therefore the three-year statute of limitations applies. (Doc. 84 at 16–17.) Thurston asserts that Defendants conduct was willful because they based her performance reviews, PIP, and ultimate termination on her absences which should have been protected leave. (*Id.*)

Under the FMLA, an action must generally be brought within two years "after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). This limitation is extended to three years for a "willful violation." § 2617(c)(2). "[T]o benefit from the FMLA's three-year statute of limitations, a plaintiff must show that her employer either knew or showed reckless disregard for whether its conduct violated the Act." *Olson v. United States*, 980 F.3d 1334, 1339 (9th Cir. 2020).

The Court need not determine if Defendants' alleged actions were willful because whether the two- or three-year statute of limitations applies, Defendants are entitled to summary judgment on all claims.

### B.    FMLA Claims

"The FMLA provides job security to employees who must be absent from work because of their own illnesses, to care for family members who are ill, or to care for new babies." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001) (citing 29 U.S.C. § 2612). To do so, the FMLA entitles eligible employees to 12 weeks of annual leave for, among other things, "a serious health condition that makes the employee unable to perform the functions of [her] position[.]" § 2612(a)(1)(D).

There are two separate FMLA claims a plaintiff can bring under 29 U.S.C. § 2615(a). First, "[u]nder § 2615(a)(1), it is 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise' the substantive rights guaranteed

by FMLA." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting § 2615(a)(1)). "When a party alleges a violation of § 2615(a)(1), it is known as an 'interference' or 'entitlement' claim." *Id.* at 777–78 (citing *Bachelder*, 259 F.3d at 1124). Second, "[u]nder § 2615(a)(2), it is 'unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.'" *Id.* at 777 (quoting § 2615(a)(2)). "An allegation of a violation of this section is known as a 'discrimination' or 'retaliation' claim." *Id.* (citing *Bachelder*, 259 F.3d at 1124).

Thurston's FAC alleges both types of FMLA claims: a claim for interference, Count 1, and a claim for retaliation, Count 2. (Doc. 13 at 15–18.) For the retaliation claim, Thurston alleges that Defendants "retaliated against her by terminating her employment." (*Id.* ¶ 122.) However, when an employee is terminated for taking or requesting FMLA leave, the claim is analyzed as a claim for "interference" under § 2615(a)(1), not as a claim for retaliation under (a)(2). *Xin Liu v. Amway Corp*, 347 F.3d 1125, 1133 n.7 (9th Cir. 2003) ("In this circuit, however, we have clearly determined that § 2615(a)(2) applies only to employees who *oppose* employer practices made unlawful by FMLA, whereas, § 2615(a)(1) applies to employees who simply take FMLA leave and as a consequence are subjected to unlawful actions by the employer." (emphasis in original)).

Thurston does not allege that Defendants retaliated against her because she opposed unlawful violations of the FMLA by Defendants, nor does Thurston argue that she was terminated for opposing any such violations. The Court has found no allegations in Thurston's FAC which support a retaliation claim under the FMLA. Accordingly, because Thurston has alleged that she suffered a negative employment decision after requesting FMLA leave, the Court construes her "retaliation" claim as an "interference" claim in violation of § 2615(a)(1). Therefore, to the extent the parties make arguments concerning a retaliation claim, the Court will consider them applicable to the interference claim.

To establish a prima facie case of FMLA interference, a plaintiff must show: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3)

she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Sanders*, 657 F.3d at 778.

Thurston alleges that Defendants interfered with her FMLA rights, as prohibited by § 2615(a)(1), in two ways: first, by failing to notify her of her right to FMLA leave and, second, by using her protected FMLA leave as a factor in their decision to terminate her.

### 1. Failure to Notify

Defendants argue that they satisfied their obligation to notify Thurston of her FMLA rights at the first opportunity, when she first linked her performance issues to her medical condition at the PIP meeting. (Doc. 77 at 11–12.) Defendants also emphasize that their FMLA leave policy was available to all employees, they posted the statutorily required FMLA notice, Thurston discussed FMLA with HR prior to becoming eligible, and that Thurston has experience using FMLA leave with a prior employer. (*Id.* at 12.) Lastly, Defendants argue that if they failed to notify Thurston, she suffered no prejudice because all her time-off requests were granted. (*Id.* at 12–13.) Thurston responds that Defendants knew that she had a qualifying condition before the PIP meeting but failed to notify her once she became eligible for FMLA leave. (Doc. 84 at 18–19.) Thurston argues she suffered prejudice because she received reprimands, the PIP, and was ultimately terminated for performance and absences that should have been protected leave. (*Id.* at 19–20.)

"It is the employer's responsibility to determine when FMLA leave is appropriate, to inquire as to specific facts to make that determination, and to inform the employee of his or her entitlements." *Xin Liu*, 347 F.3d at 1134. But the FMLA "provides no relief unless the employee has been prejudiced by the violation." *Olson*, 980 F.3d at 1338 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

Defendants do not dispute that Lance knew Thurston was experiencing health issues prior to Thurston's October 2020 surgery. (Doc. 89 at 6.) Moreover, there is evidence that HR contacted Thurston to discuss FMLA leave options at that time, but she was not yet eligible. (Doc. 77-2 at 178, 190.) Then after the October 2020 surgery, Thurston informed

Lance that she was "totally fine" and "doing really well." (*Id.* at 249.)

Thurston points to no facts after her October 2020 surgery, before or after she became FMLA-eligible in December 2020, that would have put Defendants on notice prior to May 2021 that Thurston required FMLA leave.[2] (*See* Doc. 84 at 5–10, 17–19.) Instead, the record shows that her absences were often only "a couple of hours at most" or "a day . . . here and a day there" for doctors' appointments. (Doc. 77-2 at 54.) But an "employer must be made aware that the absence is due to a serious illness so that the employer can distinguish it from ordinary sick-days." *Marquez v. Glendale Union High Sch. Dist.*, No. CV-16-03351-PHX-JAT, 2018 WL 4899603, at *24 (D. Ariz. Oct. 9, 2018). And during this time Thurston took a weeklong international vacation to Turks and Caicos. (*Id.* at 250–51.)

Thurston concedes that after the meeting regarding the PIP, in May 2021, Defendants informed her of her right to FMLA leave. (Doc. 84 at 11.) Yet Thurston repeatedly makes generalized assertions that Defendants knew of her health issues before then. The record, however, does not show that Defendants had any notice that Thurston was suffering from a "serious health condition" from October 2020 to May 2021. *See* 29 U.S.C. § 2611(11) (defining "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider.")

Even if Defendants had failed to notify Thurston of her rights under the FMLA, her claim still fails because she suffered no prejudice. Defendants approved all of Thurston's time-off requests and she was never unable to attend a doctor's appointment. (Doc. 77-2 at 29, 54–55.) *Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1271 (W.D. Wash. 2013) (noting "even if there is a technical violation under FMLA, an employee who does not suffer any harm and receives all leave requested is not entitled to relief"); *see also*

---

[2] Thurston asserts that during this time she "told Defendants that she was constantly vomiting and that it made it hard for her to be in the office." (Doc. 84 at 9.) But this misstates the cited deposition testimony. Rather, Thurston testified that her "constant vomiting and things like that" occurred "mainly prior to surgery," which took place in October 2020. (Doc. 84-2 at 41.)

*Merrill-Smith v. La Frontera Arizona Empact SPC*, No. CV-16-02677-PHX-ROS, 2020 WL 1952591, at *4 (D. Ariz. Apr. 23, 2020) (noting that to demonstrate prejudice plaintiff "needed to point to evidence that she would have structured her leave differently had [defendant] explicitly informed her that she was taking FMLA leave"). Thurston never complains that she was not granted all requested leave.

Thurston complains that her "various absences related to her medical condition would have been protected from reprimands if Defendants had notified her of her right to use FMLA leave." (Doc. 84 at 20.) But this only confirms that Thurston took time off work when needed. Fallout from her absences is not the required showing of prejudice for a failure to notify claim. *See Ragsdale*, 535 U.S. at 90 (finding no prejudice from the failure to give notice because the employee "ha[d] not shown that she would have taken less leave or intermittent leave if she had received the required notice"). Whether Thurston was ultimately terminated because of her need for FMLA leave is a question under her interference-by-termination claim, but not for this interference-by-failure-to-notify claim. Accordingly, Defendants are entitled to summary judgment on this claim.

### 2. Termination

Defendants argue that they terminated Thurston's employment "following consistent and well-documented underperformance and unprofessional behavior." (Doc. 77 at 13–15.) Thurston responds that her need and request for FMLA leave were a negative factor in her termination. (Doc. 84 at 20–28.) Thurston asserts that her health issues led to criticism of her work which led to the PIP which ultimately led to her termination. (*Id.* at 20–22.) Thurston also contends that she was not underperforming and that Defendants were aware of her health issues prior to the partially negative Ad Hoc Performance Review in August of 2020.  (*Id.* at 22–25.)

"Where, as here, a plaintiff alleges retaliation for exercising [her] rights under the FMLA, the claim is properly analyzed as an interference claim under § 2615(a)(1)." *See Zaki v. Banner Pediatric Specialists LLC*, No. CV-16-01920-PHX-DLR, 2018 WL 4637276, at *6 (D. Ariz. Sep. 26, 2018). To sustain such a claim, a plaintiff must show by

a preponderance of the evidence that: (1) she took or requested protected leave; (2) the employer subjected her to an adverse employment action; and (3) the taking of or requesting protected leave was a "negative factor" in the adverse employment decision. *See Bachelder*, 259 F.3d at 1125; 29 C.F.R. § 825.220(c). "Although an employer may not use FMLA leave as a negative factor in employment decisions, there is no cause of action under the FMLA if the termination results . . . from the employee's own performance problems." *Liston v. Nev.*, 311 F. App'x 1000, 1002 (9th Cir. 2009) (cleaned up).

It is undisputed that Thurston requested protected leave and that her termination constitutes an adverse employment action. The key consideration at summary judgment here is "whether there is a triable issue of material fact as to whether the FMLA leave [requested] by [Thurston] was impermissibly considered as a factor in her termination." *Xin Liu*, 347 F.3d at 1136. There is no such triable issue. Defendants have provided extensive evidence documenting Thurston's performance problems. Thurston has not rebutted or provided contrary evidence. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.")

First, Lance provided Thurston with an Ad Hoc Performance Review in August 2020. (Doc. 77-2 at 154–160.) The review identified positive aspects of Thurston's performance but also documented "consistent feedback" from "a large group of representatives" that Thurston "comes across as argumentative or confrontational at times when she does not feel that other person is right in their statement or she feels strongly about something being discussed." (*Id.* at 160.) Lance suggested that Thurston "try to keep her emotions out of work discussions and simply agree to disagree." (*Id.*) The review also identified that Thurston should grow in her knowledge of the products. (*Id.* at 159.)

On September 30, 2020, Thurston was absent from a meeting without notifying Lance. (*Id.* at 226.) Then on October 8, 2020 Lance had to "Reset[] Expectations" including expected work hours, sharing Thurston's schedule so that others knew her availability, responsiveness, and again knowledge of products. (*Id.* at 228.) In November 2020 Thurston

displayed a lack of attention to detail when she used the incorrect employment title for Boothe in a draft letter after being corrected on this several times previously. (*Id.* at 255–58.) In January 2021 Lance received feedback from several employees after Thurston held a meeting that Thurston displayed a lack of knowledge regarding the products within her purview. (*Id.* at 276.) In February 2021, Thurston was reclassified from a Senior Product Manager to a Product Manager because a significant portion of her responsibilities had been removed from her. (*Id.* at 282.)

On March 2, 2021, a meeting between Thurston and two other employees became heated resulting in a report to HR. (Doc. 77-3 at 11–13.) Then after having a year to prepare, Thurston gave a presentation that was "lackluster" and again displayed a lack of knowledge concerning the products involved. (*Id.* at 42.) All these documented incidents resulted in Thurston being placed on a PIP. (*Id.* at 44–49, 51, 54–56.) Finally, on June 17, 2021, Thurston disrespected Lance at a meeting in front of other employees. (Doc. 77-2 at 86–87.) This resulted in Thurston's termination. (Doc. 77-3 at 128.)

To support the reality of Thurston's performance problems, Defendants provide evidence that Thurston was placed on a PIP by both her employers before and after her employment at Western Alliance: JP Morgan Chase & Co. in 2018 and Popular Bank in 2023. (Doc. 77-3 at 93–95, 100–03). Those PIPs document the same patterns of behavior as the PIP from Defendants: conflict with others, attendance and availability, and presentation quality. (*Id.*) This belies any assertion that the PIP was pretextual or that Thurston's FMLA was a negative factor in her adverse employment decision. Accordingly, Defendants are entitled to summary judgment on this claim.

### C.    Intentional Infliction of Emotional Distress Claim

Defendants argue that Thurston's claim for intentional infliction of emotional distress ("IIED") fails because Thurston has no evidence that Defendants' conduct was extreme and outrageous or that Defendants had the requisite intent. (Doc. 77 at 17–18.) Thurston disagrees. (Doc. 84 at 29.)

To establish a claim for IIED, a plaintiff must show: (1) the defendant engaged in

extreme and outrageous conduct; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his or her conduct; and (3) severe emotional distress occurred because of the defendant's actions. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987); *see also Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1058 (9th Cir. 2007). "To recover for this tort, the plaintiff must show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Stoker v. Hartford Life and Accident Ins. Co.*, 355 F. Supp. 3d 893, 899 (D. Ariz. 2019) (quoting *Johnson v. McDonald*, 3 P.3d 1075, 1080 (Ariz. Ct. App. 1999)). "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities . . . There is no occasion for the law to intervene in every case where someone's feelings are hurt." Restatement (Second) of Torts § 46, cmt. d (A.L.I. 1965). "It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of [IIED]." *Durand v. City of Phoenix*, 271 F. App'x 645, 646 (9th Cir. 2008) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l., Inc.*, 905 P.2d 559, 563 (Ariz. 1995)).

Thurston does not present such a case. Thurston argues that Defendants' alleged acts of "humiliating her, making false statements against her, holding medical issues against her," withholding FMLA leave, and terminating her employment were sufficiently extreme and outrageous. (Doc. 84 at 29.) At her deposition, Thurston testified that she attributed the following conduct to her emotional distress: "accusations of like delaying the Reg D" project; someone telling her, "Oh, you weren't in your office" when she was; receiving the PIP; "a lack of understanding what's going on . . . like coming down on me about maybe not being at the office at a specific time and that was mainly prior to [the October 2020] surgery;" and "negative feedback in some way or another." (Doc. 77-2 at 89, 91–93.)

Thurston does not point to any conduct by Defendants that rises to the level of

extreme and outrageous but only to generalized conduct that at worst could be perceived as mere insults to which liability does not attach. *See* Restatement § 46, cmt. d. Thurston's termination, without more, does not support a claim for IIED. *Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386–87 (Ariz. Ct. App. 1994) (finding that the dismissal of an employee in front of the news media was not conduct that would sustain an IIED claim); *Mintz*, 905 P.2d at 562–64 (finding that termination decisions are generally insufficient to directly raise an IIED claim and holding that defendant's "failing to promote Plaintiff, forcing her to return to work, and hand delivering a letter to her while in the hospital" was not "extreme" or "outrageous" conduct). Defendants are entitled to summary judgment on Thurston's IIED claim.

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 77) is **GRANTED**. The Clerk of the Court is directed to enter judgment accordingly and terminate the case.

Dated this 15th day of July, 2026.

Douglas L. Rayes
Senior United States District Judge